NOTICE

Decision filed 05/12/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220820-U

NOS. 5-22-0820, 5-22-0821 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MIKAYLA M. and SHYLA D., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Coles County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 21-JA-29, 21-JA-30 |
| | ) | |
| Shannon D., | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's finding of unfitness is reversed where neither respondent's service plan nor the agency's dispositional report was ever filed with the court, the court's dispositional order failed to set forth respondent's services, the first filing of respondent's required services was six months into the nine-month period utilized by the State to claim unfitness, and the circuit court's findings regarding respondent's reasonable progress and reasonable efforts were against the manifest weight of the evidence.

¶ 2    The respondent, Shannon D., appeals the judgment of the Coles County circuit court finding her unfit pursuant to sections 1(D)(m)(i) and 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2020)). She further appeals the circuit court's order that found it was in the best interest of the minor children to terminate her parental rights. On appeal, she argues the

1

circuit court's findings were against the manifest weight of the evidence. We agree and, for the following reasons, reverse the circuit court's findings and orders.

¶ 3                                    I. BACKGROUND

¶ 4      Shannon is the biological mother of Shyla D. (born November 25, 2006) and Mikayla M. (born March 27, 2019). On May 11, 2021, Mikayla was seen near the road and the Department of Children and Family Services (DCFS) was called. The caller stated they picked up Mikayla, walked to the nearest house, and were told the child did not reside there but to try the neighbor's house. A male child, who appeared to be approximately 11 years old, said "there you are" and took the child from the people in the car. DCFS went to Shannon's house to investigate the incident. Shannon told them she fell asleep watching a movie and Mikayla was only outside for about five minutes. She advised the agency that she was a prior heroin addict. The agency required Shannon to perform an oral drug test which revealed positive results for methamphetamine, amphetamine, and THC.

¶ 5      On May 17, 2021, the State filed petitions for adjudication of wardship for both children alleging neglect in that the minors were not receiving proper or necessary support (705 ILCS 405/2-3(1)(a) (West 2020)) and were in an environment injurious to the minors' welfare (*id.* § 2-3(1)(b)), due to Shannon's abuse of illegal substances while in a caretaker role and failure to adequately supervise the children. Shannon appeared at the shelter care hearing and admitted neglect. The court found probable cause of neglect. A parent-child visitation plan was also filed on May 17, 2021, which provided Shannon one visitation period a month. Shannon was required to provide 24-hour notice of any cancellation or rescheduled arrangement. The plan set the dates, times, and locations as "TBA."

2

¶ 6     The adjudicatory hearing was held on June 11, 2021. Shannon provided a partial admission that conceded she abused an illegal substance. The court accepted the admission and set the dispositional hearing for July 9, 2021.

¶ 7     On June 29, 2021, Court Appointed Special Advocates (CASA) submitted a report stating Shyla had a very strong bond with her mother and did not like her biological father. Shyla stated that her father exposed himself to her and made inappropriate comments. She was mentally in a "bad spot" and received counseling prior to moving to Illinois. Shyla and Mikayla were placed with fictive kin. Mikayla had an abrasion between her eyes from jumping off a swing. She did not say any clear words but did make gestures to make her needs known and was able to follow simple directions. The report indicated Shannon had weekly one-hour supervised visits with the children that went well and stated Shannon had "an emotional bond with her children." The report recommendations stated Shannon should "cooperate and communicate with One Hope United and engage in services such as mental health counseling, substance abuse treatment and domestic violence treatment to correct the conditions that brought her children into care." On July 8, 2021, CASA was appointed as guardian *ad litem* for the children.

¶ 8     The dispositional hearing was held on July 9, 2021. Shannon was present. The State asked the court to adopt the findings in the One Hope United[1] (OHU) dispositional report; however, the court stated it only had the CASA report and was advised the dispositional report was emailed directly to the trial judge.[2] The service plan recommendations found therein were not read into the record. The court stated it would enter an order consistent with the recommendations contained in

---

[1]DCFS contracted with OHU for this case.
[2]The record contains no copy of the OHU dispositional report.

3

the dispositional report; however, the circuit court's order only referenced the report. The order did not list any of Shannon's required services or include a copy of the OHU dispositional report.

¶ 9　　On January 7, 2022, OHU and CASA's separate permanency reports were filed with the court. Information from those reports revealed that Shannon was receiving Social Security Insurance (SSI) but was seeking employment. The author of the OHU report, Tessa Cochrane, noted that she only recently obtained the case. She stated the record was unclear whether Shannon had been assessed and the previous caseworker had no information either. Shannon's listed services included: substance abuse assessment and treatment, drug screens, mental health, parenting education, and visitation. The report stated, "At this time, this worker cannot confirm or deny that the assessment was completed or that [Shannon] is engaged in any substance use services." The report indicated that the agency had no signed consents, so verification of information was not available. Shannon's drug testing revealed a failure to appear on July 8, 2021, and November 24, 2021. Testing on October 27, 2021, and December 6, 2021, was positive for amphetamine, methamphetamine, and THC. The report stated that Shannon was not engaged in mental health counseling because she was dropped due to nonattendance. She completed her parenting classes in November 2021. Her supervised visitation continued to go well. However, she needed to engage in substance abuse and attend mental health counseling. Ms. Cochrane requested a permanency hearing in three months, stating she was "very recently assigned this case and would like further time to gather information on parent's progress or lack thereof as well as further information on this case in general." The recommendations included a return home in 12 months goal and requested findings that included, *inter alia*, Shannon had not made reasonable and substantial efforts towards the return of the children.

4

¶ 10    The reports further indicated that the children were moved into traditional foster care in November 2021 after Shyla missed 19 of 35 school days due to sleeping on a couch with two children under the age of three sleeping next to her on the floor. The report stated that Shyla alleged molestation by her biological father. The father advised the agency that a return home to him was not an option. Shyla originally attended Cumberland High School but was transferred to Bridges, an alternative school, after behavior and vaping incidents. She informed a teacher at Bridges that she "hates foster care[,] and her life is terrible." CASA stated that "Shyla is struggling with being in foster care and wanting to return to her mother" but classified the mother-daughter relationship as "toxic." Shyla was on a waiting list for counseling but was taking antidepressant medication. Mikayla was doing well. She was very active and had to be monitored closely because she was a climber and tended to want to escape from the indoors. She presented to the new foster family needing to be treated for head lice and exhibiting sexual behaviors and profane language.

¶ 11    The permanency hearing was held on March 18, 2022. Shannon's counsel agreed with the recommendation of return home for the suggested goal and the findings regarding Shannon's efforts and progress. The court entered an order adopting the recommendations contained in the permanency report and set the case for hearing in three months.

¶ 12    On June 13, 2022, CASA and OHU filed their permanency reports. Shannon remained unemployed but had suitable housing. She completed a substance abuse assessment and started treatment but was unsuccessfully discharged due to a lack of attendance on May 10, 2022. Shannon told OHU that she was in treatment at Life Links, but that information was not confirmed. Shannon's drug testing revealed THC and amphetamines, but the worker stated it was likely the latter finding was from Shannon's ADHD prescription. The OHU report listed Shannon's services as "parenting classes, substance abuse assessment and treatment, mental health assessment and

treatment, cooperate and communicate with the agency, get suitable housing, and have a legal source of income." The report stated Shannon completed the parenting classes, was cooperative and communicative, and had suitable housing.

¶ 13    The children were placed with a new foster family on April 28, 2022, after Shyla ran away from the prior foster family home. The prior foster family sent a picture of a positive at-home drug test administered on Shyla. Shyla was now in counseling and was prescribed Zoloft. Mikayla continued to present with intermittent sexual behavior and profane language which the prior foster family stated mostly occurred after visits with Shannon. The reports further noted that Mikayla liked to escape from the house, so the foster parents installed bells on the doors to alert them and keep her safe. The CASA report recommended Shannon cooperate with OHU, complete services, and correct the conditions that brought the children into care or risk CASA requesting a goal change to substitute care and termination of her parental rights at the next hearing. CASA requested the next permanency hearing be set in three months. OHU also recommended a setting for the next permanency hearing in three months and stated, "if services are not satisfactory at that time, the case should proceed to legal screen."

¶ 14    The case proceeded to a permanency hearing on June 17, 2022. None of the parties objected to the permanency recommendations. The court advised Shannon that if she were not making substantial effort and progress at that time, it was likely the case would proceed to legal screening by DCFS to determine if termination of her parental rights should occur. The court admonished Shannon that she was "running out of time." Shannon acknowledged the court's statement. The order found Shannon made reasonable efforts toward returning the children home but had not made reasonable and substantial progress. The court scheduled the next hearing for September 23, 2022.

¶ 15    On September 12, 2022, OHU filed a permanency report stating Shannon was evicted from her residence and was staying with a friend in Neoga, Illinois. Shannon advised the caseworker she was employed but the caseworker had not confirmed the employment. Shannon was reassessed for substance abuse counseling on August 11, 2022, but failed to show for the in-person assessment and medical screen on August 22, 2022. Her alleged mental health treatment at Life Links had not been confirmed. She was scheduled for random drug testing on six occasions but only completed testing on one date. That test was positive for amphetamines due to her ADHD medication. The CASA report indicated the children were moved from the second foster family and placed with fictive kin on September 11, 2022. The report indicated that Shyla was taken to the emergency room for mental health trouble after she told the foster parent that she felt her only option was suicide or at least hurting herself so her mother would stop blaming her. She was transferred to Lincoln Prairie and released on July 13, 2022. The CASA report also indicated that the prior foster parent stated Shyla broke every house rule including drinking a case of alcohol in June, smoking illegal substances in July, and sneaking vapes. They stated she refused to do chores, was frequently irritable with Mikayla, was verbally abusive to the other foster children, and would threaten the children and then laugh. The foster parent stated the children were afraid. Shyla was not engaged in mental health services and stated she did not want to return to her mother but wanted to keep a relationship with her. Mikayla continued to present with intermittent sexual behaviors and profane language. She was lagging in education and did not know colors, numbers, or letters. CASA did not know if Mikayla was currently in preschool or therapy. The foster family sent a communication to CASA stating, "Due to the deteriorating situation and lack of support from the caseworker, we have sent a letter discontinuing care as of September 3. Shannon knows where we live and both Shannon and Shyla are acting very neurotic at times now and we no longer feel comfortable."

7

Recommendations for Shyla included, *inter alia*, reengaging in mental health services, a referral for a psychological or psychiatric evaluation, and an evaluation of the efficacy of her medication.

¶ 16    The permanency hearing was held on September 23, 2022. The State advised the court that it filed a motion for termination of parental rights earlier in the day. The petition alleged that Shannon failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)), failed to make reasonable efforts to correct the conditions that were the basis of the children's removal during the period from December 21, 2021, through September 21, 2022, pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)), and failed to make reasonable progress toward the return of the children during the same period pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)). The petition requested a finding of unfitness and the termination of Shannon's parental rights. The court advised Shannon of the petition and the allegations of unfitness. Shannon's counsel denied the allegations and requested a hearing. The matter was set for hearing on November 10, 2022.

¶ 17    On November 10, 2022, OHU filed a termination hearing report indicating that Shannon was still looking for a place to live and her employment at MARS was verified. She was scheduled for five random drug screens and attended one, but the test was unable to be completed due to a facility malfunction. Most of the three-hour visits did not last the entire time. The report stated that Shyla and Mikayla were moved to a different foster home on October 24, 2022. Shyla was now in Charleston High School which was bigger than she was used to and posed some obstacles. She was doing very well in school when she was in attendance. She was struggling with her mental health, and due to consents, it was a struggle to get her proper medication. Mikayla was in Head

8

Start and was also in play therapy due to her behaviors. She was also referred to Sexual Assault Counseling and Information Services (SACIS) due to sexualized behaviors.

¶ 18    The CASA report indicated that Shyla had her own room at the new foster home but had a hard time waking up and missed several days of school. A student at the school threatened to fight her. She was not currently engaging in mental health counseling or taking her prescribed medications because the caseworker was struggling with the insurance company about consent. Shyla stated that she did not want to return home to her mother but wanted to keep a relationship with her. Visitation was inconsistent due to Shannon's mandatory overtime. Shyla stated she no longer wished to attend visitation. Mikayla had trouble falling asleep and took melatonin at night. She struggled with disruptive behavior at Head Start and the foster parents were often called to retrieve her. CASA recommended a goal change to substitute care pending determination of parental rights.

¶ 19    The State's motion to terminate proceeded to hearing on November 23, 2022. The State procured testimony from Tessa Cochrane, a caseworker at OHU, who testified that she was assigned to the case on January 5, 2022. She reviewed the notes of the prior caseworkers when she took over the case. She stated no integrated assessment was ever performed on Shannon. Ms. Cochrane had no idea how the service plan was developed for the case since no integrated assessment was performed. She stated the goals were rated as unsatisfactory when she was given the case, but she was unsure how the goals were set without the integrated assessment. She testified that she never reviewed the service plan goals with Shannon and had no contact with her during the two months she was on the case. She attempted to call Shannon multiple times but eventually determined she was using an incorrect telephone number. She also tried to reach Shannon on a different number but could not recall if that number had voicemail. Ms. Cochrane did make an

unannounced visit to the house and left a note for Shannon but could not recall the address of the house. She believed the visit occurred in either late February or early March 2022. After two months, she handed the case off to Lindsey Spitz. The only document Ms. Cochrane received was a parenting completion document. She had no evidence that Shannon was making reasonable efforts towards the goals during the two months she was involved with the case. On cross-examination, Ms. Cochrane confirmed the integrated assessment was never done and stated it was usually performed in the first 45 days of the case. She did not know why it was not completed or if Shannon was ever asked to participate in an integrated assessment.

¶ 20    The State next called Lindsey Spitz, an OHU caseworker, who took the case from Ms. Cochrane in late February 2022. When she took the case from Ms. Cochrane, they discussed the service plan, where the kids were placed, and tried to go to Shannon's house on February 28, 2022. She stated the information indicated that not many services were completed. The only service completed was the parenting class. Ms. Spitz stated that Shannon was sent a letter by mail to the house in Mattoon. She initially stated it was sent after the attempted visit but later stated it was sent before the visit.

¶ 21    Ms. Spitz stated that Shannon eventually contacted and provided her with a telephone number on March 11, 2022. She testified that she continued to talk to Shannon in March 2022, mostly getting to know her. In April 2022, they continued to converse and discussed the different services, specifically the drug screens. Ms. Spitz testified that Shannon came into the office on March 17, 2022, received her service plan, and signed it. At that time, she advised Shannon of her obligations which included: parenting classes, substance abuse assessment and any subsequent treatment, and mental health assessment and recommended treatment. Shannon was to engage with Central East Alcoholism and Drug Council (CEAD). Ms. Spitz could not recall if Shannon

10

provided any proof that she had engaged and was not certain if she asked Shannon why she had not completed anything. She stated that she advised Shannon of the services and nothing else was mentioned, stating the purpose of the March 17, 2022, meeting "was to have Shannon sign the service plan."

¶ 22 Ms. Spitz testified that her later communications with Shannon involved providing a reference to HOPE of East Central Illinois for personal matters and providing her with information for housing from the Department of Human Services. She stated that by the time she found a grant to help Shannon with her rent, Shannon had already been evicted.

¶ 23 Ms. Spitz stated that while she was the caseworker, Shannon never had stable housing, but she did become employed at the end of May 2022 at Bimbo Bakeries. She believed Shannon was evicted in either April or May 2022. Shannon mentioned getting an apartment in Sullivan but eventually moved in with a friend in Neoga. She stated that Shannon enrolled in CEAD for substance abuse evaluation and treatment but was discharged for lack of attendance in May 2022. Since then, Shannon reengaged and was wondering how to reenroll. She had an appointment on November 2, 2022, with another appointment scheduled for November 10, 2022.

¶ 24 Ms. Spitz confirmed Shannon did not successfully complete substance abuse treatment. She stated that a substance abuse assessment was also scheduled in August, but Shannon did not attend. Ms. Spitz testified that she spoke with Life Links, and they confirmed Shannon was a patient there. She stated they did not get into "the extent of that," but Shannon was seeing a counselor at that facility. Ms. Spitz confirmed that she had a signed release from Shannon for that facility, but she was not provided with any other documentation or clarification regarding Shannon's treatment. She stated that Shannon made reasonable efforts toward the mental health goal by attending counseling and stated that she was satisfactory for that goal, but Shannon did not

11

make reasonable effort or substantial progress toward obtaining an evaluation and treatment for substance abuse. She stated Shannon's drug screen attendance was haphazard. From March 2022 to November 2022, she missed seven tests and attended five. The five tests attended were positive for THC and amphetamine, but Ms. Spitz explained that Shannon's prescription medication could cause the positive test for amphetamine. The most recent testing was scheduled a week prior to the hearing. Shannon could not attend so the testing was performed at her workplace. She stated that Shannon was now receiving testing at Help at Home in Charleston.

¶ 25    Ms. Spitz testified that the only remaining service was visitation and Shannon's overall cooperation with the agency. She stated Shannon had regular visits. After the integrated assessment was completed, she was given eight hours of visitation which was to be supervised by the foster parents, but the foster parents were not comfortable with the arrangement, so Shannon's time was reduced to three hours with agency supervision. Ms. Spitz had no information regarding the foster parent visitation because no notes were taken. Once the visitation became supervised by the agency, Shannon failed to confirm prior to the visits, so there were scheduling issues. She stated there was no visitation by Shannon from February 2022 to May 2022. From May 2022 to November 2022, there were less than 10 visits for the weekly three-hour visits. Most of the time, this was due to Shannon failing to call and confirm the day before. When she observed the visits, the caseworker stated, "For the most part, I would say that it goes well." Many visits were cut short due to the location not necessarily working out because the girls had vastly different interests due to the differences in their ages. Ms. Spitz described her communication with Shannon as sporadic but when they did communicate Shannon was very informative, would let her know what was going on, and would talk with her about the kids. Aside from the service plan, Ms. Spitz had no other concerns that might prevent the children from returning home.

¶ 26    On cross-examination, Ms. Spitz stated that an integrated assessment was completed before she was the caseworker. She did not have the date it was completed and stated it was in the computer system. As to substance abuse, Ms. Spitz stated that Shannon advised her that she was reaching out to ABBCON Counseling Corporation for substance abuse treatment but to her knowledge it was unsuccessful because Shannon reenrolled at CEAD on November 3, 2022. As to the positive tests, Ms. Spitz stated that all were positive for THC and two also had amphetamine. She was aware that Shannon had medical treatment but did not ask for releases to obtain those records. As to visitation, Ms. Spitz explained that one visitation was at a library; there was not much for Shyla to do, and Mikayla was rambunctious. She stated the supervisor's notes indicated that Shannon spent time with both girls during the visits and demonstrated that she cared about them. Thereafter, the State rested.

¶ 27    The defense called Shannon to testify. She was currently renting a room in Mattoon and had been doing so for two months. She did not consider it a permanent residence. She stated she was employed at MARS Pet Care and had been working there since July 2022. She was working full time at that job and was also attending online classes at Post University, which she started in August 2022. She was taking business management classes.

¶ 28    Shannon testified that she had her own residence until she was evicted in July 2022. She then moved into her car for about a month. She was in contact with Ms. Spitz during that time and begged her for assistance but received no response for a month and a half. Shannon stated that she attempted to get started with substance abuse treatment at ABBCON counseling after the last court date. She was currently engaged in CEAD. Her next appointment was December 10, 2022. She stated she completed the substance abuse assessment three times. Her current recommendation was for group and individual counseling. She continued to work with CEAD until she could get

13

into ABBCON. She explained that she could not get into ABBCON because the facility could not pull her name up in the insurance bank. She tried for weeks to get through to the insurance company but then went back to CEAD because she wanted her children to come home.

¶ 29    Shannon testified that she never participated in the integrated assessment and was never asked to participate in one. She stated she was doing her mental health counseling at Life Links and her counselor's name was Tammy. She had meetings every other week. During her homeless period, she would participate in counseling by phone in her car. Her sessions were supposed to be an hour, but they usually lasted two hours. She also received mental health treatment at Life Links with Dr. Rowjee, who prescribed her medication. She was on two mood stabilizing anxiety pills and Adderall. She stated she was compliant with her medications.

¶ 30    With regard to visitation, Shannon agreed there were problems. Shannon testified that she tried to make the kids comfortable and happy during the visits and she suffered not seeing the children for as long as possible but stated the children came first. If they had to leave, they had to leave. She stated that she stopped one of the visits because Mikayla was running in the street and DCFS was chasing her down the road. "She was three years old, so we had to stop the visit. I didn't want to. I wanted to see my kids." That was the same visit that Ms. Spitz attended. At another visit, Shyla had an anxiety attack at the library, so that visit was stopped too. She stated she did have video visits, in addition to the in-person visits. The video visits with Mikayla were supervised, but the video visits with Shyla were not.

¶ 31    Shannon explained that it was not her fault that she missed the drug testing stating she "never refused to get a test." She stated that she tried methamphetamine when the girls were taken away and went off the deep end but got sober three months later. She had been sober ever since. She admitted to smoking THC and stated it did not interfere with her work. She stated that her

14

attendance was not good at work when she was sleeping in her car, but the company worked with her because they knew she was homeless. She also stated that her telephone was not always in service because she could not afford it.

¶ 32    Shannon testified that the only caseworker who helped her was Rami, whom she had at the beginning. Shannon stated that she responded to Ms. Cochrane's note, but by that time, Ms. Cochrane was already off the case. Shannon stated that her only face-to-face meeting with Ms. Spitz was when she went to the office and begged her for the service plan on March 17, 2022. The only other time she saw her was during one visit with the children. Most of her communication with Ms. Spitz was via text message. She only called Ms. Spitz once and that was following Shyla's hospitalization in July 2022. Ms. Spitz did not answer or respond to her call.

¶ 33    On cross-examination, Shannon explained that Shyla did not like to go to visitation because Mikayla would act up. Every visit was disrupted because Shyla did not want to be there because the baby was annoying her. She wanted to be with her friends. Shannon stated that she was allowed to video visit with the kids every night when they went to bed. Shyla did not like to attend those, so they were mostly with Mikayla. Shannon and Shyla would video visit every day. She explained that the issue was just that Shyla did not like to attend with Mikayla. Shannon was also asked for more specificity about her current living arrangements. She stated that she worked at MARS and a person there introduced her to Chad. She did not know him and did not live with him in a normal way. She just rented a room from him. She did not really talk to him or anything. She agreed Chad also lived in the home she was renting from him. She stated that she contacted Ms. Spitz prior to being evicted and asked her for resources or a way to help her not lose her home. She did not get a response for over a month and by then she was living in her car. At that time, Ms. Spitz told her

she could come to the office, fill out paperwork, and get help to pay the back rent, but by then it was too late.

¶ 34    Shannon was also questioned as to why it was not her fault that she did not attend drug testing. Shannon explained that Ms. Spitz switched the drug testing to Sarah Bush. When Shannon went to Sarah Bush she was not allowed to test because she did not have an ID. Ms. Spitz kept sending her to test at that facility although she knew Shannon did not have an ID that would allow her to test at that facility. Ms. Spitz finally moved her back to testing in Charleston. When she returned to the Charleston facility, they could not test that day and she went to her employer's testing and was tested. The State asked why she did not have an ID, and she stated that the DMV will not provide one without a home address that can receive mail, which she did not have.

¶ 35    Shannon admitted to testing positive for cannabis and stated the finding of amphetamine was due to Adderall, which she took three times a day to help her focus and calm down. However, she did not believe it was working.

¶ 36    She stated she had Rami as her first caseworker for approximately three months. Rami told her OHU was going to make her a service plan, that she would receive the service plan and would have to abide by it. She had a bunch of caseworkers after that. She confirmed that she never sat for an integrated assessment. When asked how she knew to take the parenting class, she stated that Rami directed her to take it. She knew she needed a mental health evaluation and substance abuse evaluation, but she never received "a clear form that this is your service plan, this is what you need to be doing. Rami's suggestions were all I was running on." She stated that she never had a copy of what she was supposed to do until March 17, 2022, when she requested a copy from Ms. Spitz.

¶ 37    Following closing arguments, the circuit court found the State failed to show that Shannon failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors'

16

welfare. The court noted the case was 18 months old and that Shannon did make some effort and some progress. The court noted her completion of parenting classes and the two years of ongoing mental health treatment but found the latter "inconclusive," stating:

> "The Court didn't receive any information \*\*\* related to that treatment as to whether or not it's effective or whether—aside from [Shannon] feeling it has a positive impact on her life, but there's no prognosis given as to [Shannon's] ongoing mental health, so it's difficult for the Court to draw a conclusion either way as to whether the progress made related to [Shannon's] mental health was substantial."

¶ 38    The court found Shannon's cooperation in the case sporadic but noted there were at least three different caseworkers which made it difficult for any parent to have any consistent communication with a caseworker when they changed so often. The court balanced this with the fact that the burden regarding contact was on the parent and the lack of contact fell on Shannon.

¶ 39    With regard to visitation, the court stated the shortened visits were Shannon's fault and she could have enforced the time limits. The court expressed concern about what Shannon would do if there were no supervisors or caseworkers to hand the children off to. While the court stated it would balance the agency supervised visitation evidence with the newly obtained information revealing that Shannon had frequent video visitation with Mikayla, no conclusion regarding visitation was provided.

¶ 40    The court stated it had "serious questions regarding stable housing beyond the eviction" including the missed rents before then. As to Shannon's current housing, the court noted it was "a single bedroom in another individual's home" that Shannon did not know very well and was "[c]ertainly not suitable for children. Certainly not suitable for reasonable progress to correcting these conditions." The court further questioned Shannon's financial struggles when she was

17

employed full time at a factory, stating, "It's difficult for me to understand why there is this ongoing financial issues when [Shannon] is employed full-time."

¶ 41 The court noted multiple missed drug screens and that every single test taken was positive for THC. The court noted that it was a legal substance but stated:

"[T]he bottom line is someone with a substance abuse issue shouldn't be engaging in any substances. I wouldn't be comfortable with an alcoholic coming in court and telling me, I drink alcohol every day. And I'm not comfortable with someone who admittedly has a substance abuse issue taking substance, mood-altering substances, but when I consider the totality of the circumstances, there has just been too much time to pass and not nearly enough progress made for the Court to find that the conditions are even close to being corrected in this case, and based on that I'm going to find the State has proven by clear and convincing evidence that [Shannon] has failed to make reasonable efforts or progress towards the return of the children to her care during the nine-month period; specifically December 21st of 2021, through September 21st of 2022."

¶ 42 Thereafter, the court proceeded with the best interest hearing. The State called Ms. Spitz who stated the children were first placed with fictive kin and moved in with a foster family on October 25, 2022. She stated the foster family lived in a three-bedroom apartment and Mikayla and Shyla had their own rooms. Since that time, two additional foster children were added to the home. Ms. Spitz testified that the current foster parents expressed interest in adopting Mikayla. When asked their position regarding Shyla, Ms. Spitz stated Shyla was old enough to decide which route she wanted to go, so she talked to Shyla about the options of independence and adoption. She stated the foster family wanted to adopt Mikayla, but she could not confirm they wanted to

adopt Shyla. She stated that she witnessed the children in this home and described it as a loving home.

¶ 43    Shannon stated, "I got to go. I can't take this anymore." A brief recess was taken and upon Shannon's return, the hearing resumed. Ms. Spitz testified that Mikayla was excited in the foster house and loved to play, talk to people, and run around. Ms. Spitz stated Shyla was asleep when she visited and after Mikayla woke her up, she was unhappy. She stated that both Shyla and Mikayla appeared well-groomed and healthy. The only issue that had arisen since Shyla was at the house involved issues with her medication. The caseworker stated that neither child expressed concerns, malcontent, or gave her red flags as to their safety, health,  or well-being. She observed the children with the foster parents, and stated they had a loving relationship.

¶ 44    On cross-examination, Ms. Spitz stated the girls had always been placed together except once and admitted they had been through five placements. She was unsure why they were moved from the first place and stated they were moved from the second and third places due to behavioral reasons. After that "we just struggled to find somewhere willing to take both of them because we didn't want to split them up" so "they were in *** three temporary placements." She stated the behavioral issues involved both girls. She agreed the girls had been in their current placement less than a month but stated they were handling the transition pretty well. She further admitted that she had not witnessed Shyla and Mikayla with the two additional children that recently moved in. She stated the new children included a 3-year-old girl and an 11-year-old boy. She stated  Shyla wished to maintain contact with her mother and the caseworker believed "this was likely to happen." Shyla wanted a goal of independence the last time they spoke. She saw Shyla and Mikayla three times in their current residence and did not observe any behavioral issues with either child while she was there. She also confirmed that she did not see any behavioral issues when the girls were with

19

Shannon either. She stated the behavioral issues were observed when the caseworker was moving the children or taking them somewhere they needed to be. She stated Shyla had not expressed any opinion recently as to whether she wanted to be returned to Shannon and agreed Shyla "went back and forth on that issue."

¶ 45 Closing arguments were waived by the State and Shannon's attorney. CASA argued that it would be in the best interests of the children to terminate Shannon's parental rights because "they are with a foster family that appears to be able to deal with any behavioral issues that have previously started in any previous placements, and I would ask that the Court give them a chance to be a part of this foster family life."

¶ 46 Thereafter, the court stated:

"All right, this is a somewhat unusual situation for [a] best interest hearing. The testimony is that, first of all, the girls have switched placements five times, which is a very unusual amount of time for the kids to be in any single placement. Five changes [are] a lot.

The other concern the Court has is the most recent placement *** hasn't even been a month yet. *** [T]he only testimony the Court has heard today is that the children are well taken care of, well groomed. They have their own rooms. The environment that they are living in is a loving environment, but it's frankly, a limited amount of information for the Court to rely on, and now there's the added change with the household *** [with] two new potential foster children that have been placed in the home.

So I think it's a tougher decision than typically necessary on a best interest hearing, but considering the only evidence that I have presented, I think the State has proven by a preponderance of the evidence that it is in the best interest today that this motion be granted.

20

So I will enter an Order today. I am going to hold off on setting an immediate permanency hearing because the evidence today presented is inconsistent at least as to Shyla as to whether or not the goal in this case is going to be an adoption or a goal of independence, so I want to give the parties an opportunity to prepare a report and to make recommendations and present evidence, if necessary, to the Court."

¶ 47    On December 2, 2022, CASA submitted a permanency report. Shyla was 16 years old and remained in the foster family home, continued to attend high school, missed several days in the last few weeks, and had not consistently seen her counselor at Life Links during the reporting period. She was scheduled for a psychological evaluation on December 9, 2022. After the last hearing, Shyla "stated emphatically to this CASA that she desires a goal of independence." Five days later, Shyla advised her that she still did not have all her prescribed medication. She had the sertraline, but still needed prazosin and trazodone. Following a call to the caseworker, the insurance issue was resolved, and the medications were available for pickup that day. The foster family stated that Shyla had not yet been fingerprinted but planned to get it done. The reporter stated, "This CASA observes Shyla to be a personable, intelligent young person who feels she's ready to take care of herself. Shyla appears to be resourceful, self-sufficient, and mindful of her circumstances. This CASA further observes Shyla to struggle between making better choices for herself and resorting to choices she's made under the influence of her mother."

¶ 48    With regard to Mikayla, the foster family reported no profane language or sexual behavior. OHU made a referral to SACIS, but the facility required the current foster parents to reach out to them before treatment would be started. Mikayla struggled with disruptive behaviors in school, and the foster parents were often called to retrieve her. Her most recent behaviors involved hitting

21

and biting her teacher along with spitting on her classmates. She was also diagnosed with reactive attachment disorder (RAD).

¶ 49    The OHU report, filed December 15, 2022, stated that Shyla was not consistently attending Charleston High School and informed the foster family that she wanted to transfer back to Cumberland High School. The caseworker was trying to work out a plan to ensure Shyla could attend the school where she felt more comfortable. Shyla was struggling with her mental health, and due to consents, it was a struggle to get her proper medication. She recently got all her needed medication, but due to the lapse and inconsistency with taking it, Shyla had a mental health crisis. She agreed to go to Sarah Bush Lincoln Emergency Room, and it was deemed necessary for her to be transferred to The Pavilion Foundation in Champaign, Illinois. Shyla was currently hospitalized to get proper medication and treatment.

¶ 50    Mikayla was struggling with her behavior at school and her best days were considered "decent" behavior. There was a meeting scheduled for December 13, 2022, to discuss her education. She was participating in play therapy due to her behaviors. She also demonstrated sexual behaviors, so she was referred to SACIS.

¶ 51    The report also addressed Shannon and stated the following:

> "Throughout Shyla's mental health crisis, Shannon was allowed to visit with Shyla before she was taken to the hospital. Shannon was supportive and concerned about Shyla and her safety and was a help in calming Shyla down while she was in the ER. However, this worker was informed that Shyla and Shannon had visits prior to this that were not approved by the foster parent or caseworker. This worker would like to see this not continue and for visits to be approved before they occurred."

¶ 52    OHU recommended Mikayla's permanency goal be changed to adoption. The agency recommended that Shyla's permanency goal be changed to independence.

¶ 53    The permanency hearing was held on December 16, 2022. At that hearing, Shannon advised the court that she wished to appeal the court's prior rulings and counsel was appointed. After Shannon left, the court stated that it believed the recommendation for goals was adoption for Mikayla and independence for Shyla. It stated, "I think my CASA report agrees with those recommendations." CASA and the State joined in those recommendations. Thereafter, the court entered a permanency order changing Mikayla's goal to adoption and Shyla's goal to independence. The trial court's order stated the reason for the goal change as, "Parental [r]ights have been terminated and Shyla is of age and desires to be independent."

¶ 54                                    II. ANALYSIS

¶ 55    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq*. (West 2020)). After a petition for involuntary termination is filed under the Juvenile Court Act, a two-step process is required for parental rights termination. See 705 ILCS 405/2-29(2) (West 2020). Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re C.P*., 191 Ill. App. 3d 237, 244 (1989). As such, the State must first establish, by clear and convincing evidence, that a parent is unfit under one of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Tiffany M*., 353 Ill. App. 3d 883, 889 (2004). "If the court makes a finding of unfitness, the court then considers whether it is in the best interests of the child that parental rights be terminated." *In re C.W*., 199 Ill. 2d 198, 210 (2002).

23

¶ 56    On appeal, Shannon argues that the trial court's findings of unfitness pursuant to sections 1(D)(m)(i) and 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2020)) were against the manifest weight of the evidence. She further argues that the trial court's finding that it was in the children's best interest to terminate her parental rights was against the manifest weight of the evidence. In the alternative, Shannon argues that her trial counsel was ineffective.

¶ 57                              A. Unfitness

¶ 58    The circuit court found Shannon was unfit on two grounds alleged by the State. In a proceeding to terminate parental rights, "[a] parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). "This means that, on review, if there is sufficient evidence to satisfy any one statutory ground we need not consider other findings of parental unfitness." *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).

¶ 59                          1. Reasonable Progress

¶ 60    "The overriding purpose of the Juvenile Court Act is to ensure that the best interest of the minor, the minor's family, and the community are served." *In re C.N.*, 196 Ill. 2d 181, 209 (2001). The Act provides "the procedures to be followed in cases, such as the present one, including abused, neglected or dependent minors." *Id*. " 'Progress' ordinarily denotes movement or advancement toward a goal." *Id*. at 211. Our supreme court held that the benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *Id.* at 216-17. In reaching this conclusion, the court noted that

24

"in light of the 'deep human importance' of parental rights and responsibilities [citation], and the fundamental liberty interest at stake [citation], courts must take care to ensure that the statutory requirements for service plans are met in every case, and that the overall focus in evaluating a parent's progress toward the return of the child remains, at all times, on the fitness of the parent in relation to the needs of the child." *Id.* at 216.

¶ 61 On appeal, Shannon argues that the trial court's finding of unfitness was against the manifest weight of the evidence, given the "inefficiencies of One Hope's efforts in this case." On review, we will find the circuit court's findings are "against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." *In re N.G.*, 2018 IL 121939, ¶ 29. Shannon's arguments address the numerous caseworkers involved in this matter, the agency's failure to perform an integrative assessment, the agency's failure to file the dispositional report with the court, the agency's failure to provide Shannon with a copy of the service plan until she "begged" for it on March 17, 2022, and the agency's failure to provide timely communicative responses when Shannon reached out to the agency. Shannon also argues that the trial court shifted the burden from the State to her in making two of its findings.

¶ 62 A " '[s]ervice plan' means a written plan on a form prescribed by [DCFS] in the plan toward the permanency goal for the children required by 42 USC 675(5), 325 ILCS 5/8.2, and 89 Ill. Adm. Code 315 (Permanency Planning)." 89 Ill. Adm. Code 301.20 (eff. May 3, 2019). In order for a state to receive federal funding, the service plan must include, *inter alia*, a "plan for assuring that the child receives safe and proper care *and that services are provided to the parents*, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child ***." 42 U.S.C. § 675(1)(B) (2018). A service plan is "designed to stabilize the family situation" and includes

25

alternative situations including keeping the family together, reunification when safe and appropriate, or moving the child toward a different and permanent legal status. 20 ILCS 505/6a(a) (West 2020). The service plan is to be prepared and filed with the court within 45 days after the minor is placed in shelter care. 705 ILCS 405/2-10.1 (West 2020). The agency must also "file with the court and serve on the parties a parent-child visiting plan, within 10 days" of its appointment as the executive temporary custodian of the child. *Id.* § 2-10(2). That plan sets out, *inter alia*, "the time and place of visits, the frequency of visits, the length of visits, who shall be present at the visits," and may provide other means of communication between the parent and child. *Id.*

¶ 63    In order to determine whether the trial court's finding of unfitness for failure to make reasonable progress was against the manifest weight of the evidence, we consider Shannon's service plan and the court's directives. Upon review of the record, no court directive setting forth Shannon's services was ever issued, and no service plan is contained in the record.[3] Considering the testimony, in conjunction with the State's closing arguments at the fitness hearing, it is also questionable as to whether Shannon's integrated assessment was ever performed. As explained by Ms. Cochrane, the integrated assessment is used to determine what services are required by the parent as well as the parent's progress in reaching the goal of completion on the service plan.

¶ 64    We note that despite the statute's use of the word "shall" regarding the preparation and filing of a service plan, Illinois courts have classified the statutory filing requirement for a service plan as "directory" as opposed to "mandatory." *In re L.O.*, 2016 IL App (3d) 150083, ¶ 21. In *L.O.*, the service plan was not filed with the court. *Id*. ¶ 7. However, a dispositional report, one addendum, and an integrated assessment report were filed. *Id*. ¶ 6. After finding the respondent

---

[3]We also note that the visitation plan, although filed with the court, provided none of the required statutory information.

unfit, "the trial court ordered respondent to complete several tasks *** designed to correct the conditions that led to the adjudication and removal" of the child. *Id.* ¶ 10. The specific tasks recited by the court included: cooperation with the agency, drug and alcohol assessments, psychological examinations and compliance with any recommended treatment, drug testing, individual counseling, a parenting course, a domestic violence course, obtain and maintain stable housing, visitation, participate in an undated integrated assessment interview, and abstain from alcohol and drugs not prescribed by a physician. *Id.* The issue on appeal was whether the trial court had authority to order respondent to perform certain services in the absence of an agency-filed service plan as required by statute. *Id.* ¶ 19. After finding no particular consequences stemmed from the agency's failure to timely file the service plan, the court found the statute directory, and the trial court's authority to provide the service directives was proper. *Id.* ¶ 21.

¶ 65    Here, unlike *L.O.*, the record contains no integrated assessment or dispositional order and there was no recitation from the trial court as to what services Shannon was to perform—in addition to no service plan being filed with the court. The State claims these absences are acceptable because "there is no doubt what the requirements of respondent's service plan were or that respondent knew what she needed to do." The State relies on the June 29, 2021, CASA report and Shannon's testimony that her initial caseworker advised her as to what some of her expected services might be. As to the latter, we find the mere suggestion of what might be encompassed in the service plan an insufficient substitute for an actual service plan.

¶ 66    The State's reliance on the CASA report is equally unwarranted. The report was filed prior to CASA entering its appearance as the guardian *ad litem* (GAL) in the matter. A GAL represents the best interest of the minor and presents recommendations to the court consistent with that duty after meeting with the minor, assessing the circumstances, and determining what disposition might

be in the minor's best interest. *People v. Austin M*., 2012 IL 111194, ¶ 69. While the GAL report contained a list of recommendations that included a statement that Shannon "was to communicate and cooperate with One Hope United and engage in services such as mental health counseling, substance abuse treatment and domestic violence treatment," no basis for the recommended services was provided in the report. Further, the State cites no authority allowing a GAL to prepare a parent's service plan, which is not surprising considering the statute requires DCFS or its assignee (here OHU) to prepare the plan. 705 ILCS 405/2-10.1 (West 2020).

¶ 67 Reliance on CASA's recommendation is further undermined by the January 7, 2022, OHU permanency report filed nine months after the CASA report. The OHU document listed Shannon's services as substance abuse assessment and treatment, drug screens, mental health, parenting education, and visitation. There is no mention of the domestic violence service previously listed by CASA. The agency report also listed services not included in CASA's report. The agency's June 14, 2022, permanency report listed three additional services not found in the January 2022 report. This report stated, as "[p]er the service plan," Shannon was to "complete parenting classes, substance abuse assessment and treatment, mental health assessment and treatment, cooperate and communicate with the agency, get suitable housing, and have a legal source of income." These service requirements are the same as those listed in the agency's November 10, 2022, termination hearing report. As such, we believe these are the accurate requirements; however, Shannon's argument regarding the agency's failure to timely provide her with the necessary information regarding her service plan, or how to complete the requisite services, must also be considered in the analysis.

¶ 68 The period of unfitness alleged in the State's petition was from December 21, 2021, through September 21, 2022. Accordingly, we consider Shannon's progress with these services

28

solely for the period listed, remaining mindful that Shannon was not provided with her service plan until she was three months into the period alleged by the State and the first written record of her service requirements was not filed with the court until June 14, 2022, nearly six months into the period alleged by the State. There is no dispute that Shannon completed the parenting classes and the court recognized Shannon's achievement of this goal.

¶ 69    The second requirement was substance abuse and treatment. The record reveals Shannon performed the substance abuse assessment three times at CEAD, the facility preferred by OHU. The record further revealed that Shannon attempted to get into ABBCON, in August 2022, but was unsuccessful due to insurance issues. There is no dispute that Shannon failed to complete any substance abuse program. What remains unclear however, is whether the service plan requirements stemming from the first substance abuse assessment were ever relayed to Shannon.

¶ 70    In addition to substance abuse and treatment, Shannon was required to submit to drug testing. The initial testing performed prior to removal of the children revealed positive tests for methamphetamine, amphetamine, and THC. The State's petition alleged neglect based on Shannon's use of illegal drugs. Drug testing prior to the alleged period revealed positive tests for methamphetamine, amphetamine,[4] and THC.[5] Testing performed during the alleged period revealed a positive test for THC on March 24, 2022. Testing on April 7, 2022, and April 15, 2022, was positive for THC and amphetamines. Testing performed on April 27, 2022, May 5, 2022, and May 13, 2022, was positive for THC. Testing performed on May 18, 2022, was positive for THC and amphetamines. Testing performed on June 9, 2022, was positive for amphetamines. Shannon

---

[4]It is undisputed that Shannon was prescribed Adderall for ADHD, and the prescription can result in a positive finding for amphetamine.

[5]THC is short for tetrahydrocannabinol, which is the chemical associated with cannabis and marijuana. THC is legal in Illinois. Cannabis Regulation and Tax Act (Pub. Act 101-27 (eff. June 25, 2019)).

did not complete testing on May 26, 2022, June 3, 2022, June 15, 2022, July 1, 2022, or August 31, 2022.

¶ 71　The November 10, 2022, agency termination report indicated that five additional random tests were scheduled; however, no comments regarding whether any of those dates were within the State's prescribed period or reasons for nonattendance, if applicable, were provided. At the hearing, Ms. Spitz testified that "in some instances there's been errors on our end with scheduling and things like that." Shannon explained that Ms. Spitz sent her for drug testing at Sarah Bush, but she could not obtain testing at that facility due to her lack of a valid identification card. She further testified that she advised Ms. Spitz of this issue but Ms. Spitz continued to send her to Sarah Bush and only recently returned her drug testing to Help at Home in Charleston. Here, we find the agency's dilatory response to Shannon's inability to perform drug testing at Sarah Bush gives further credence to Shannon's claims of agency ineffectiveness and undermines reliance on the presumption that a parent's failure to perform drug testing will be treated as a positive test result.

¶ 72　With regard to the services related to substance abuse and drug testing, the trial court stated:

"[T]here were multiple drug screens missed, and every single drug screen that was taken showed positive for THC, and while that is a legal substance, the bottom line is someone with a substance abuse issue shouldn't be engaging in any substances. I wouldn't be comfortable with an alcoholic coming in court and telling me, I drink alcohol every day. And I'm not comfortable with someone who admittedly has a substance abuse issue taking substances, mood-altering substance."

¶ 73　While the court's position is understandable, the position is untenable due to the lack of any directive issued by the court that required Shannon to abstain from smoking marijuana. The State contends the court issued a directive to Shannon regarding the use of marijuana at the shelter

30

care hearing. However, the record does not support the claim. The issue at the shelter care hearing was whether the children should be removed. The basis of the removal was the positive finding for methamphetamine classified as "illegal drugs" by the State. The court stated, "Even though marijuana is legal in the State, if it prevents somebody from paying attention to or caring for their child, that could be a problem just as alcohol can be, or in excess alcohol." Nothing in that statement directed Shannon to abstain from marijuana. At most, the statement only indicated that Shannon should limit her marijuana use to levels that would not affect her ability to care for her children.

¶ 74    Nor is there any evidence that the agency directed Shannon to abstain from marijuana. "[I]t is improper to terminate a parent's rights on grounds not alleged in a petition to terminate." *In re D.W.*, 214 Ill. 2d 289, 308 (2005). Here, the State's petition to terminate claimed Shannon "failed to make reasonable progress toward the return of the child to the parent." The State's petition of neglect, which was the basis of the children's removal, alleged Shannon "abuses illegal substances while in a caretaker role of minor." The children were removed due to Shannon's use of *illegal* drugs. However, the record is devoid of any finding that Shannon used *illegal* drugs at any time during the State's alleged period.

¶ 75    While the State claims, "Patently, [Shannon] abysmally failed to deal with her substance abuse problem," we disagree. It was undisputed that Shannon's positive result for amphetamine was based on her ADHD prescription and, as noted above as well as by the trial court, marijuana is legal in Illinois. While Shannon tested positive for amphetamine, reliance on those tests for a finding of illegal drug use is suspect given the testimony that Shannon's prescriptions could have caused those results. As such, the lack of finding by the trial court of any illegal drug use is evidence of reasonable progress especially given Shannon's lack of structured treatment.

31

¶ 76   "[I]n assessing substantial fulfillment of the parent's obligations, the court must 'recogniz[e] that compliance with DCFS service plans is a means to a desired end, not the end in itself ***. A parent might succeed at reaching a goal envisioned by DCFS without following DCFS' specific directives.' " *In re F.S.*, 322 Ill. App. 3d 486, 492 (2001) (quoting *In re S.J.*, 233 Ill. App. 3d 88, 120 (1992)). For these reasons, the trial court's finding that the State proved by clear and convincing evidence that Shannon failed to make reasonable progress regarding the substance abuse is not supported by the record and therefore is against the manifest weight of the evidence.

¶ 77   The third service requirement was for Shannon to have a mental health assessment and engage in any recommended treatment. The record revealed that Shannon was in counseling during the period at issue. The agency reports indicated that Shannon repeatedly advised them of her participation; however, the agency, which admitted it had the necessary executed consents from Shannon, failed to confirm her attendance until the termination hearing. OHU also failed to obtain Shannon's records, or any statement of progress from either her counselor or her physician. Such omission is relevant because the court specifically noted it did not receive any information "related to that treatment as to whether or not it's effective or whether—aside from [Shannon] feeling it has positive impact on her life, but there's no prognosis given as to [her] ongoing mental health." The court found it "difficult *** to draw a conclusion either way" as to whether Shannon made substantial progress with her mental health.

¶ 78   On appeal, Shannon argued that the trial court shifted the burden of proof. No argument on this issue was provided by the State. Given the court's conclusion, or lack of conclusion, we cannot disagree. The State always bears the burden of proof at the fitness portion of the termination hearing and must present "clear and convincing" evidence of unfitness. *In re M.D.*, 2022 IL App

(4th) 210288, ¶ 75. Here, the State's failure to present evidence supporting its claim that Shannon failed to make reasonable progress regarding her mental health service requirements, cannot result in "difficult[y] *** to draw a conclusion either way." The court's inability to reach a conclusion is the equivalent of pronouncing that the State failed to support its allegation on this issue with clear and convincing evidence. Although no definitive ruling was issued by the trial court regarding Shannon's progress for this service, the lack of any ruling is erroneous given the State's burden. The error is further exemplified by Ms. Spitz's testimony that Shannon would be satisfactory for the mental health goal. As such, the trial court's failure to find reasonable progress for this service is against the manifest weight of the evidence.

¶ 79     The fourth service requirement was cooperation and communication with the agency. The reports issued by OHU during the applicable period were dated January 7, 2022, June 14, 2022, and September 12, 2022. The January 7, 2022, report, which did not even list this as a service requirement, stated Shannon "continues to remain cooperative with One Hope United" but noted difficulty in communicating with Shannon. We note, however, the report was prepared by Ms. Cochrane who was only on the case two days before issuing the report. The second report stated, "It has been reported that [Shannon] *** has been cooperative and communicative." The third report made no mention of Shannon's progress with this goal although it would appear some communication occurred because the caseworker was aware of Shannon's employment and additional visitation with the children at church.

¶ 80     Ms. Cochrane testified to difficulty in communicating with Shannon during her two-month tenure as the caseworker; however, the testimony also revealed that she had the wrong telephone number to contact Shannon and her only attempt to meet Shannon in person came when she was transferring her duties to Ms. Spitz. Ms. Spitz testified that she sent a letter to Shannon on February

33

23, 2022, and Shannon responded on March 11, 2022, by providing her with her telephone number. Ms. Spitz continued to communicate with Shannon in March just "getting to know her." Later, they started talking about doing the different services, specifically the drug screens. Those conversations began in April 2022. Ms. Spitz mentioned even later communications involving a referral and assistance when Shannon was getting evicted. In sum, Ms. Spitz described the communication between her and Shannon as sporadic but when she did answer Shannon was very informative and would let her know what was going on and talked about the kids.

¶ 81     It was Shannon who complained about the lack of communication from the agency. She testified to her repeated requests for assistance before she was evicted and the agency's failure to respond for over a month, stating that by the time the agency responded, she had already been evicted. Ms. Spitz confirmed that by the time she received the grant, Shannon had already been evicted. Shannon also testified that she only received a copy of her service plan because she went to the agency and begged for a copy of it. Ms. Spitz confirmed that Shannon came in on March 17, 2022, to receive and sign the service agreement. Finally, Shannon also testified about calling Ms. Spitz, but receiving no response, when Shyla was hospitalized for her mental health issues.

¶ 82     After hearing all the evidence, the court acknowledged that numerous caseworkers were associated with Shannon's case, and the difficulty in maintaining communication due to the inconsistencies associated with changing caseworkers. The court balanced that with Ms. Cochrane's testimony of having no communication during her two-month tenure, albeit the court did not address the fact that Ms. Cochrane was using the wrong telephone number. The court then noted that Ms. Spitz's first contact was on March 11 and stated, "but the Court is aware there were months that went by that [Shannon] had no contact and that falls on her." The court stated Shannon could have gone to One Hope United or DCFS; she could have called or gone in person, "done

34

something." The court stated, "There's just, frankly, no explanation or valid excuse how you could go that long without having any contact with anybody in this case, especially when you're represented by an attorney."

¶ 83    Given the evidence and testimony in this case, we can only assume the court is referencing the two months during Ms. Cochrane's tenure, as there are no other periods when Shannon was out of communication with the agency. On appeal, Shannon also argues that the trial court shifted the burden of proof on her. We disagree. The court's statements were not about the burden of proof, and we agree with the State that it was Shannon's responsibility to maintain contact with either OHU or DCFS during that period. See *In re Sheltanya S.*, 309 Ill. App. 3d 941, 958 (1999); *In re T.D.*, 268 Ill. App. 3d 239, 249 (1994). However, the agency's failure to diligently respond to Shannon's communications is concerning and again adds credence to Shannon's claims of agency ineffectiveness.

¶ 84    We also share the trial court's concern with the number of caseworkers involved. There was no evidence presented that Shannon was ever aware of Ms. Cochrane's services in January and February 2022, as by Ms. Cochrane's own admission, she was using the wrong telephone number to contact Shannon. Nor was there any evidence submitted that Shannon was advised of who took over after her initial three months with her caseworker, Rami, prior to Ms. Cochrane's entrance in January 2022. Regardless, even if we presume the lack of communication in January and February 2022 was solely due to Shannon's failure to contact the agency, the months thereafter revealed Shannon repeatedly attempted to communicate with the agency; however, the agency failed to timely respond regarding Shyla's hospitalization, Shannon's eviction, or her inability to perform the drug testing at Sarah Bush.

35

¶ 85    While the court suggested Shannon could have gone in person to the agency, the undisputed evidence revealed that Shannon did present to the agency on March 17, 2022, in order to obtain a copy of her service plan so she would know what she needed to complete. The evidence revealed Shannon went from having no communication in January and February 2022, to communicating with the agency thereafter. While the State claims Shannon "dismally failed to cooperate and communicate," its arguments were centered on the trial court's statement regarding the two months without contact which was at the beginning of the period. Despite the State's claims of "dismal failure," its brief confirms communication between Ms. Spitz and Shannon from March 2022 to September 2022, which shows reasonable progress from Shannon's complete lack of communication in January and February 2022. As such, any finding that Shannon failed to make reasonable progress with this service requirement is against the manifest weight of the evidence, as an opposite conclusion is clearly evident.

¶ 86    The fifth service requirement was to obtain and maintain suitable housing. Notably, Shannon's housing was not in issue prior to her eviction. While Ms. Spitz alleged Shannon's eviction occurred in May, Shannon clarified that her eviction was in July 2022, which was the seventh month into the State's alleged nine-month period. It is undisputed that thereafter, with no assistance from the agency, Shannon obtained housing and was no longer homeless and living in her car.

¶ 87    The State argues this is clear evidence of Shannon's failure to make reasonable progress. In support, the State lists Shannon's eviction date as either "late spring or early summer, 2022," and notes that thereafter Shannon lived in her car for about six weeks and was now renting a room from a guy she did not even know. The State then states that Shannon "lives this way despite the fact that Ms. Spitz got [Shannon] a grant to help pay for her rent and [Shannon] got a job in May

2022." The State notes the court's concerns with Shannon's financial issues given her full-time employment and states, "Apparently, though, [Shannon] had money to buy cannabis. In any case, a car or a single bedroom in a stranger's house is not suitable housing for a woman with two children."

¶ 88 First, the time frame for Shannon's eviction is relevant. As the court noted, the eviction was in July 2022, seven months into the period alleged by the State; as such, Ms. Spitz's testimony that Shannon "never had stable housing" while she was the caseworker was erroneous. Second, contrary to the State's contention, there was no evidence presented to support its claim that OHU's grant money was available after Shannon was evicted or how Shannon obtained marijuana. Given the agency's failure to obtain either Shannon's medical or mental health records, it is possible that Shannon's marijuana was prescribed. However, even if Shannon was buying her marijuana, the drug testing did not reveal a positive test for THC on June 9, 2022, the month prior to Shannon's eviction.

¶ 89 We also consider the court's comments regarding Shannon's transition from living in her car to renting a room at a coworker's house. The court stated, "[I]t's a one-bedroom rental in someone else's—a single bedroom in another individual's home that [Shannon] doesn't know very well. Certainly not suitable for children. Certainly not suitable for a reasonable progress to correcting these conditions." While we agree her current residence may not be considered suitable until a background check is performed on the homeowner, we disagree that Shannon's actions fail to show progress as her situation improved from homelessness to having a place to live funded by her own income. We further note this improvement occurred in less than two months.

¶ 90 There is no dispute that Shannon's eviction and descent into homelessness reveals a regression of progress. However, Shannon's ability to find housing after being homeless moved

her closer to the goal of reunification. Reasonable progress requires the parent to make, at a minimum, demonstrable movement toward the goal of reunification. *In re K.P.*, 305 Ill. App. 3d 175, 180 (1999). Here, Shannon's steps from homelessness to having a place to live funded by her own income is a demonstrable step toward reunification, especially in light of the time frame at issue, and therefore, we hold that the court's findings on this issue were against the manifest weight of the evidence.

¶ 91     The sixth service requirement was to have a legal source of income. The court questioned Shannon's finances in relation to her eviction, stating, "As it relates to income, *** it's *** difficult for me to understand why there is this ongoing financial issues when [Shannon] is employed full-time." Again, the evidence is important. Shannon had no job and was receiving SSI when the case began. She obtained two jobs, one at Casey's and one at a bakery, during the pendency of the case. However, Shannon did not obtain full-time employment at MARS until July 2022, the same month as her eviction. The service requirement was to obtain a legal source of income, which Shannon obtained. Accordingly, any finding that reasonable progress was not shown for this service was against the manifest weight of the evidence.

¶ 92     Finally, visitation was also considered by the court. Ms. Spitz testified that there was no visitation from February to May 2022 and from May 2022 to November 2022, there were less than 10 visits, mostly due to Shannon failing to call and confirm the appointment the day before. When visitation occurred, it went well, but many visits were cut short due to location not necessarily working out because the girls had vastly different interests due to their different ages. The caseworker also noted that some visitations were canceled due to Shannon's mandatory overtime at her job.

¶ 93    Shannon testified that she spoke with Shyla on FaceTime nearly every day and had supervised video visitation with Mikayla every night. She also addressed the issues that arose during visitations stating that one ended early because Mikayla was running down the street with DCFS chasing her and another ended early because Shyla was having an anxiety attack. She also stated the children had other activities they wanted to attend. While she would have preferred to have them the full time, she understood if the children needed to leave. Shannon explained that Mikayla would act up during the public visitations and those actions embarrassed Shyla, who preferred spending time with her friends over sitting in the library with Shannon while her little sister clamored for Shannon's attention.

¶ 94    After hearing the testimony, the court stated that "visitation was pretty poor" and blamed the shortened visits on Shannon's inability to handle the behavioral issues that arose during visitation. The court also expressed concern with Shannon's ability to manage her children when she could not just return them to DCFS. Thereafter, the court stated it would balance the visitation evidence with Shannon's testimony regarding her "frequent video visitation with Mikayla that the Court was not aware of." However, no determination on this issue was provided by the court. As such, we have no ruling to address on this issue.

¶ 95    We note, however, that Ms. Spitz's testimony claiming a lack of visitation from February 2022 to May 2022 was clearly erroneous. The June 13, 2022, agency report indicated that the third party who was supposed to be supervising the visitation during that period failed to document the visits and, therefore, the visits could not be verified. An inability to verify is not the same as having no visitation. Further, the failure to verify was a failure of the agency, not a fault by Shannon. We also note that the agency report specifically stated Shannon had visitation the entire weekend of March 18, 2022, at the foster family's home.

39

¶ 96    Considering the totality of circumstances, including the fact that Shannon had at least three caseworkers during the pendency of this matter, it is questionable as to whether any integrated assessment was performed, no service plan was ever filed with the court, no dispositional report was filed by the agency, the trial court's dispositional order failed to set forth any requirements of the service plan, respondent did not receive a copy of her service plan until three months into the State's alleged period of unfitness, and there was no court filing setting forth the service goals until nearly six months into the nine-month period alleged by the State, we hold that the trial court's finding that Shannon failed to make reasonable progress towards her service goals is against the manifest weight of the evidence. Even without considering the procedural deficiencies, opposite conclusions were clearly evident; one ruling was based on an erroneous shifting of the burden of proof and other service requirements had no ruling at all. As such, we reverse the trial court's finding that the State proved by clear and convincing evidence that Shannon failed to make reasonable progress toward the return of her children.

¶ 97                                2. Reasonable Efforts

¶ 98    "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent ***." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066-67 (2006). The efforts "are judged by a subjective standard based upon the amount of effort that is reasonable for that particular person." *Id*. "Parental deficiencies collateral to the conditions that were the basis for the child's removal, even if serious enough to prevent the return of the child, are outside the scope of this inquiry and are therefore not relevant." *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000) (citing *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999)).

¶ 99    The courts have repeatedly held that it is imperative for the trial court to take steps to ensure the parties are aware of the deficiencies requiring removal of their children and what steps need to

40

be taken to achieve a reconciliation and reunification of the family unit. See *In re L.L.S.*, 218 Ill. App. 3d 444, 465 (1991); *In re C.M.*, 305 Ill. App. 3d at 165-66. As noted above, the latter requirement was not established as statutorily required documents were never filed and the court's dispositional order failed to contain detailed steps for reunification. Further, it was undisputed that Shannon did not receive a copy of her service plan for nearly a year and the specific requirements to achieve reconciliation were not filed with the court until nearly a year after the dispositional hearing. These uncontested facts play heavily in Shannon's favor when considering whether her effort in rectifying the reason for her children's removal was reasonable.

¶ 100    The petition for adjudication of wardship alleged two counts of neglect in that the minors were not receiving proper or necessary support (705 ILCS 405/2-3(1)(a) (West 2020)) and were in an environment injurious to the minor's welfare (*id.* § 2-3(1)(b)). Both allegations were based on Shannon's failure to "adequately supervise the minor and minor's siblings" and her abuse of "illegal substances while in a caretaker role of [a] minor," and these were the bases of the children's removal.

¶ 101    As to the claim of adequate supervision, we note that nearly every report from either OHU or CASA revealed that in nearly every placement there were instances of Mikayla continuously attempting to escape the homes. Shannon admitted that Mikayla escaped from her house because the door was unlatched. After Mikayla's removal the reports indicated that Mikayla would climb objects to escape, and one family found it necessary to put bells on the door to alert them if Mikayla tried to run. Further evidence revealed that when DCFS brought Mikayla to a supervised visitation with Shannon, Mikayla escaped from their care and was running down the road. This issue remained prevalent throughout this case regardless of who was supervising the child. While no service specifically addressed this issue, Shannon did complete the parenting class which

41

potentially provided some insight in addressing this issue. As such, we find no evidence in the record to support a finding that Shannon failed to make reasonable efforts to correct this condition for which the children were removed.

¶ 102    The second basis for removal involved Shannon's illegal drug abuse. Here, the trial court's finding of unfitness noted that Shannon's marijuana use was legal but found her use was unacceptable. At no time did the court rely on the finding of amphetamine, which the testimony revealed was likely due to Shannon's prescription, to claim an *illegal* substance was found during drug testing in the period alleged by the State.

¶ 103    While there is no dispute that Shannon missed some of the scheduled drug testing, for the reasons set forth above, the presumption of a positive test due to a failure to appear for testing is inapplicable. The evidence revealed that Shannon presented for the testing, which is indicative of reasonable effort. Here, the results for the drug testing that was performed revealed that Shannon ceased taking illegal drugs and repeatedly presented for drug testing. As such, the trial court's finding that the State proved by clear and convincing evidence that Shannon failed to make reasonable efforts to correct the conditions that were the basis of the children's removal was against the manifest weight of the evidence. As such, we reverse the finding.

¶ 104                              B. Termination of Parental Rights

¶ 105    A termination of parental rights is proper only if a finding of unfitness is made. Here, because we have found the trial court's findings of unfitness were against the manifest weight of the evidence, the trial court's order terminating Shannon's parental rights is also reversed. While unnecessary, we are compelled to address the court's order on this issue. As noted by our supreme court, the issue is "whether, in light of the child's needs, parental rights *should* be terminated." (Emphasis in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

42

¶ 106   The statute provides factors for the trial court's decision in making the best interest determination. 705 ILCS 405/1-3(4.05) (West 2020). These factors include (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the people available to care for the child. *Id.* "The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being." *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 30.

¶ 107   While it is unnecessary for a court to address each statutory factor (*In re Z.J.*, 2020 IL App (2d) 190824, ¶ 74), the relevant factors for each case must be addressed. Here, the children were placed in over five different homes during the pendency of this case and had been in their current placement less than a month at the time of the hearing. Further, the testimony regarding the current placement did not have any information as to how the children had assimilated into the family after the foster family brought two additional foster children into the home. The foster family lived in a three-bedroom apartment and the girls had their own rooms when they were placed with this family. Indeed, the agency report specifically noted that Shyla was happy to have her own room. However, no information was provided as to the rooming assignments after the two additional foster children were brought into the home.

¶ 108   The court was cognizant of the unique situation it faced, stating "it's a tougher decision than typically necessary." However, instead of addressing the statutory factors to determine whether termination was in the best interest of the children, the court resigned itself to granting the petition to terminate. Such conclusion has no basis in these proceedings as the State is the only

43

party with a burden of proof. More important, however, is the trial court's failure to address any of the relevant statutory factors in this case.

¶ 109   Notably, the State makes no argument regarding the statutory factors on appeal. Instead, the State focuses on CASA's statements at the permanency hearing on December 16, 2022, at which time CASA advised the court Shyla "emphatically *** desires a goal of independence" and CASA's recommendation to terminate parental rights at the November termination hearing. However, neither the State nor CASA addressed Shyla's mental health issues at the best interest hearing. This is especially concerning when the first statutory factor is the "physical safety and welfare of the child" and the undisputed evidence revealed that Shyla's mental health issues, a mere four months prior to the best interest hearing, included a claim of self-harm and required a three-week admission at Lincoln Prairie Behavior Health Center.

¶ 110   Nor do we find the State's reliance on CASA's statements at the December 16, 2022, permanency hearing urging that Shyla's goal should be changed to independence to be of any merit. First, the State is considering evidence that was not before the trial court when the best interest finding was made three weeks earlier. Further, even if we were to consider the evidence and the State's claim that a GAL should function as the "eyes and ears of the court" (*In re Mark W.*, 228 Ill. 2d 365, 374 (2008)), such function did not occur in this case.

¶ 111   Here, CASA did not address Shyla's mental health issues, or Mikayla's sexualized behavior issues, at the best interest hearing despite the physical safety and welfare of the child being the first factor for consideration at that hearing. Further, neither CASA, nor the State, advised the trial court at the subsequent permanency hearing (referenced by the State on appeal) of Shyla's second mental health event following the termination of Shannon's parental rights. Nor did CASA or the State advise the court during the permanency hearing that Shyla was taken to the Sarah Bush

44

Lincoln Emergency Room, transferred to The Pavilion Foundation in Champaign, Illinois, or that she remained hospitalized at the Pavilion as of December 15, 2022.[6]

¶ 112 Equally concerning is CASA's failure to advise the court at the December 16, 2022, permanency hearing that Mikayla was diagnosed with reactive attachment disorder or that her disruptive behavior was escalating at school to include hitting and biting the teacher as well as spitting on her classmates. Instead of addressing the obvious mental health issues enveloping the children, the State argued, and CASA recommended, the trial court change Mikayla's goal to adoption with a family she had only been with for seven weeks and Shyla's goal to independence.

¶ 113 Nor do we find any merit in the State's claim that "respondent was unfit and had little, if anything, to offer the children." Following Shyla's second mental health event, the caseworker stated the following:

> "Throughout Shyla's mental health crisis, Shannon was allowed to visit with Shyla before she was taken to the hospital. Shannon was supportive and concerned about Shyla and her safety and was a help in calming Shyla down while she was in the ER."

¶ 114 "Parental rights and responsibilities are of deep human importance and will not be lightly terminated." *In re Paul*, 101 Ill. 2d 345, 351-52 (1984). The statutory factors provide guidance to the trial court in determining whether termination of parental rights is in the best interest of the minor child. Here, the trial court expressed concern over the five placements of the children during the pendency of this case as well as the fact that the current placement was less than a month. The only evidence relied on by the court was Ms. Spitz's testimony that the children were well taken care of, well groomed, had their own rooms, and were living in a loving environment. Even the

---

[6]It is equally difficult to find CASA was fulfilling the duty as the "eyes and ears of the court" or representing the best interest of the children when CASA did not even include Shyla's second mental health event in its report; the only mention of Shyla's second mental health event is contained in the OHU report.

court recognized that it was a "limited amount of information for the Court to rely on" especially with the change in the household to include "two new potential foster children." Of the four pieces of evidence provided, one was diminished by the fact that it was unlikely the girls would retain their own rooms when the foster family was living in a three-bedroom apartment.

¶ 115   Further, and not noted by the court, was the fact that no testimony or information was provided regarding how Shyla and Mikayla adjusted to or interacted with the two new foster children brought into the home. Here, it is apparent the State failed to provide the trial court with sufficient evidence to address any of the statutory factors. As such, even if the finding of unfitness had not been reversed, the trial court's finding that it was in the best interest of the children to terminate Shannon's parental rights would require reversal.

¶ 116   Finally, Shannon argues, in the alternative, that her trial counsel was ineffective by failing to present evidence or argument at the best interest hearing. Given our disposition, it is unnecessary to address this issue.

¶ 117                         III. CONCLUSION

¶ 118   For the reasons stated herein, we reverse the trial court's findings of unfitness and its order finding it was in the best interest of Shyla and Mikayla to terminate Shannon's parental rights.

¶ 119   Reversed.